UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PENNSYLVANIA LIFE INSURANCE
COMPANY,

    Plaintiff,

v.

CITY OF RIVER ROUGE,

    Defendant.
                                /

Case No. 08-14886

Honorable Patrick J. Duggan

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 15, 2009.

PRESENT:       THE HONORABLE PATRICK J. DUGGAN
                          U.S. DISTRICT COURT JUDGE

This lawsuit arises from an insurance policy contract whereby Pennsylvania Life Insurance Company ("Penn Life") agreed to provide prescription drug benefits to qualifying employees and retirees of the City of River Rouge ("River Rouge") in exchange for River Rouge's payment of policy premiums. Penn Life provided the benefits as called for in the contract for over a year and a half between 2007 and 2008 despite rarely receiving premium payments. Sometime in the second half of 2008, the parties discovered that a middleman between them had embezzled most of River Rouge's payments. On November 21, 2008, Penn Life filed this lawsuit to recover $163,472.20 in unpaid premiums from River Rouge based on breach of contract and unjust enrichment/quantum meruit. Presently before the Court are cross motions for summary judgment. The motions have been fully briefed and

the Court heard oral argument on December 10, 2009.

**I. Factual and Procedural Background**

In the second half of 2006, the River Rouge city council was considering whether to switch to a new insurance provider or to renew existing health insurance policies for its employees and retirees. (Bowdler Dep. at 10-13.) Around this time, River Rouge's life insurance representative, Pietra Hoge, introduced city officials to Adam Korejsza. (*Id.* at 8-9.) Korejsza indicated that River Rouge could enjoy significant savings by switching insurance carriers. In order that Korejsza could generate a quote for this cost-saving coverage, River Rouge's Mayor, Michael Bowdler, executed a document naming the Manhattan Group LLC—Korejsza's company—as the city's "Broker/Agent of Record." (Def.'s Mot. Ex. 2.) This gave Korejsza access to the information he needed to obtain a quote. (*Id.*)

In October 2006, Korejsza presented River Rouge with a quote for prescription drug coverage through insurance companies PharmaCare and Penn Life. Without going into unnecessary detail, the quote involved coverage for Medicare Part D eligible employees and retirees by Penn Life and coverage for all other employees by PharmaCare. (Bodrie Dep. at 20.) The quote also provided "wrap-around" coverage for claims not completely covered by Medicare Part D to be provided by PharmaCare. (Klein Dep. at 32-33.) Korejsza presented the details of this coverage with the help of PharmaCare representative Jason Klein at one or more city council meetings and the city council ultimately decided to make the switch. (*Id.* at 22-30; Bowdler Dep. at 13-28; Reiman Dep. at 10-12, 16-25; Bodrie Dep. at 13-16.)

In the months that followed, Penn Life, PharmaCare, and River Rouge completed the

necessary paperwork to make coverage effective January 1, 2007. (*See* Def.'s Mot. Exs. 6, 10.) The "Master Policy" between Penn Life and River Rouge required River Rouge to pay policy premiums in advance of coverage on the first of each month and ensured a 45-day grace period for delinquent payments before termination would take effect. (Def.'s Mot. Ex. 6.) In the policy "Implementation Guide" between PharmaCare and River Rouge, PharmaCare was authorized to release policy information to Korejsza and Korejsza was listed as a contact and broker for River Rouge. (Def.'s Mot. Ex. 6.) The implementation guide required that policy materials be sent to River Rouge employee Mary Anne Reiman and that billing invoices be sent to Reiman's secretary, Lori Bodrie. (*Id.*) Mayor Bowdler signed each page of the implementation guide. (*Id.*)

As the policies went into effect, Bodrie began receiving separate invoices from Penn Life and PharmaCare. Bodrie, however, had expected to receive a single invoice and met with Korejsza, Mayor Bowdler, and other city officials to resolve her confusion. (Bodrie Dep. at 25-27.) Ultimately, Korejsza decided that he would receive the two invoices from PharmaCare and Penn Life, request a single payment from River Rouge's treasury department, and then pay those funds over in the respective amounts to PharmaCare and Penn Life. (*Id.* at 29-32.) Korejsza communicated this new arrangement to the appropriate representatives for PharmaCare and Penn Life (Patricia Barnett and Melissa Darnell-Staton,[1] respectively) and, as of March 2007, Bodrie no longer received invoices from the insurance

---

[1]Darnell-Staton actually worked for CHCS, a third-party administrator providing administrative services to Penn Life. Penn Life and CHCS are both wholly-owned subsidiaries of Universal American. (Darnell-Staton Dep. at 8-10.)

companies. (*Id.* at 29; Darnell-Staton Dep. at 41-42; Def.'s Mot. Ex. 7.)

From the start of the insurance policies, River Rouge was delinquent in making its premium payments. Pursuant to the aforementioned arrangement, Darnell-Staton, group administrator for the Penn Life policy, contacted Korejsza on a monthly basis regarding the delinquency. (Darnell-Staton Dep. at 44-46.) Korejsza typically stalled on River Rouge's behalf, asserting that it took time to get payments approved by the city council and then disbursed by the treasury. (*Id.* at 52.) During the first year that Penn Life provided benefits, Korejsza tended to submit payments about once every two months, but only in an amount sufficient to pay for one month of benefits. (*Id.* at 44–45; Def.'s Mot. Ex. 8.) As a consequence, River Rouge's balance of unpaid premiums escalated through 2007; by March the outstanding balance was $30,469.60, in July it was $69,882.50, and in December it was $109,049.30. (Def.'s Mot. Ex. 8.) Because of the occasional payments by Korejsza, however, Penn Life management did not pursue termination of River Rouge's policy for non-payment. (Darnell-Staton Dep. at 53-58.)

Meanwhile, River Rouge had been regularly submitting premium payments in-full and on-time to Korejsza each month. Because of the arrangement whereby Korejsza received all billing invoices, however, River Rouge employees remained unaware of the growing delinquency. At some point in October 2007, Bodrie requested a subscriber list from Darnell-Staton for the purpose of verifying the identity of the enrollees in the insurance policy. (Pl.'s Mot. Ex. K.) Darnell-Staton responded by attaching a copy of the most recent invoice for the policy. (*Id.*) The invoice included the requested subscriber list and also revealed an amount due and owing of $127,586.30. The content of the e-mails between

4

Bodrie and Darnell-Staton, however, did not discuss or mention the growing delinquency. (*Id.*)

In June 2008, one of Korejsza's sporadic payments was reversed by the bank for insufficient funds. (Def.'s Mot. Ex. 8.) Penn Life then decided it was time to demand that River Rouge become current in its payments. (Darnell-Staton Dep. at 58.) That same month, when the unpaid premium balance exceeded $173,000, Darnell-Staton bypassed Korejsza and directly contacted Bodrie regarding River Rouge's delinquency. (Def.'s Mot. Ex. 9.) Bodrie responded with shock and explained that River Rouge's "broker" (i.e. Korejsza) should have been forwarding payments. (*Id.*; Bodrie Dep. at 34-35.) When River Rouge officials turned to Korejsza for an explanation, Korejsza blamed bank error and the fact that he was still attempting to verify the amount charged on some of the invoices. (Bowdler Dep. at 69-74; Bodrie Dep. at 34-46.) Ultimately, though, River Rouge discovered that Korejsza had been embezzling its premium payments.

Penn Life continued providing benefits to qualifying River Rouge employees and retirees through September 2008 until River Rouge obtained replacement coverage from another insurance carrier. (Bodrie Dep. at 61.) When the Penn Life policy terminated, there remained an unpaid balance of $163,472.20. (Def.'s Mot. Ex. 8.) On September 17, 2008, the River Rouge city council passed a resolution approving payment of the delinquency to Penn Life. (Pl.'s Mot. Ex. N.) Two days later, however, the council rescinded that resolution. (Pl.'s Mot. Ex. O.) On September 24, 2008, River Rouge filed a civil suit in Wayne County Circuit Court against Korejsza alleging that he embezzled more than $1 million in premium payments intended for Penn Life and PharmaCare. (Pl.'s Mot. Ex. B ¶¶

20, 35.) In the complaint for that lawsuit, River Rouge asserts that it had a contract with Korejsza for the administration of the Penn Life policy and that Korejsza was thereby required to forward River Rouge's premium payments to Penn Life. (*Id.* ¶¶ 15-17, 37-40.) Because of that relationship, River Rouge identified Korejsza as its agent, broker, middleman, and fiduciary. (*Id.* ¶ 67.) The Court remains unaware of the current status of that lawsuit.

As discussed above, Penn Life filed the present lawsuit to recover the $163,472.20 in unpaid premiums from River Rouge in November 2008. The Court now turns to the pending motions for summary judgment.

**II. Standard of Review**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric*

6

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

### III. River Rouge's Motion

River Rouge filed its motion for summary judgment on September 29, 2009. Therein, River Rouge presents three arguments for the dismissal of Penn Life's claims. First, River Rouge argues that, because of a condition subsequent, the contract between the parties terminated in early 2007 rendering later premiums unrecoverable by Penn Life. Second, River Rouge asserts that the contract between the parties violated Michigan statutory law and is therefore null and void. Third, River Rouge maintains that Penn Life either waived its claim to the unpaid premiums or is barred from recovery by the doctrine of laches. Each argument will be addressed in turn.

### A. Condition Subsequent

The insurance contract between the parties in this case contains the following provision: "This Policy will terminate at 12:00 am on the date . . . that the Grace Period expires and any premium amount due from the Policyholder remains unpaid." (Def.'s Mot. Ex. 6 at 12-13.) In a separate section, the contract defines the grace period as 45 days from premium due

7

dates, which were set at the first of each month. (*Id.* at *iii*, 11-12.) River Rouge asserts that these provisions created a condition subsequent requiring termination of the contract as soon as the city became 45 days delinquent. Because River Rouge was never current in its premium payments, River Rouge argues that the contract terminated on or before April 1, 2007. Penn Life counters that the above quoted language merely makes the contract voidable at Penn Life's option.

Although this case presents the unusual circumstance wherein it is the insured, rather than the insurer, seeking termination for late payment, the case law is nonetheless clear that the insurer may waive enforcement of a policy provision that allows for termination upon expiration of a grace period without payment. *See Glass v. Harvest Life Ins. Co.*, 168 Mich. App. 667, 670, 425 N.W.2d 107, 108 (1988); *see also Pierce v. Capitol Life Ins. Co.*, 806 P.2d 388, 391 (Colo. Ct. App. 1990) ("[W]hile the policy states that it will terminate 'automatically' if payments are not received before the expiration of the grace period, such a clause means only that the policy is voidable at the option of the insurance company."). By continuing to provide benefits to River Rouge's employees and retirees, Penn Life clearly waived its right to terminate the policy upon expiration of the grace period. And, even if the contract required Penn Life to terminate the contract, the fact remains that River Rouge's employees continued to receive and accept the benefits of the insurance policy through the fall of 2008. These circumstances give rise to, and Penn Life has properly pled, a claim for relief in quantum meruit. *See* Compl. ¶¶ 24-29; *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194, 729 N.W.2d 898, 903 (2006). Having received the benefits of Penn Life's insurance coverage, River Rouge cannot avoid liability for the policy premiums by

8

merely pointing to the expiration of the grace period in early 2007.

## B. Violation of Michigan Statutory Law

River Rouge next argues that the insurance policy in this case violates Michigan statutory law, rendering it unenforceable. Under Michigan law, "An insurance producer shall not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer." Mich. Comp. Laws. Ann. § 500.1208a(1). River Rouge asserts that the insurance policy in this case violated that law because Korejsza acted as Penn Life's agent without being duly appointed. River Rouge's attempt to avoid liability on this basis fails for several reasons.

As an initial matter, the insurance policy at issue in this case does not violate the aforementioned statute. The insurance policy in this case constitutes a promise by Penn Life to provide insurance coverage to qualifying River Rouge employees and retirees in exchange for River Rouge's promise to pay insurance premiums. Nothing in the contract requires that Korejsza act as agent for Penn Life. Such an agreement does not violate Michigan statutory law.[2] In response, River Rouge notes that Korejsza is listed as a "broker" in the PharmaCare policy implementation guide. (Def.'s Mot. Ex. 10.) When read in context, however, the implementation guide appears to list Korejsza as *River Rouge's* broker, not PharmaCare's (or Penn Life's). (*Id.*) This leads to the next reason why River Rouge's statutory argument must fail.

---

[2]Not surprisingly, River Rouge failed to identify and the Court was unable to locate any authority holding that a violation of § 500.1208a(1) renders a related insurance policy contract unenforceable.

9

The second problem with River Rouge's argument is that the evidence in this case fails to establish that Korejsza acted as an agent to Penn Life. The Michigan statute requiring appointment of insurance agents does not apply where the insurance producer "is not acting as an agent of an insurer." Mich. Comp. Laws Ann. § 500.1208a(1). As a general rule, "an independent insurance agent or broker is an agent of the insured, not the insurer." *Harwood v. Auto Owners Ins. Co.*, 211 Mich. App. 249, 254, 535 N.W.2d 207, 209 (1995). This case presents no exception to that rule.[3]

The evidence in this case indicates that Korejsza acted as River Rouge's agent. Time and again, witnesses deposed in this case—including River Rouge's own employees—testified that Korejsza acted as agent for River Rouge or that River Rouge, not Penn Life, initiated the payment procedure using Korejsza as a middleman. (Reiman Dep. at 32, 46-47; Bodrie Dep. at 25-35; Bowdler Dep. at 58; Darnell-Staton Dep. at 41; Klein Dep. at 22-24.) Furthermore, in its separate civil suit against Korejsza, River Rouge states that it had a contract with Korejsza for the administration of the prescription drug plans and that Korejsza acted as River Rouge's agent, broker, middleman, and fiduciary. (Pl.'s Resp. Ex. B ¶¶ 15, 37-40, 67.) Under these circumstances, Penn Life had no statutory obligation to appoint Korejsza as its agent.

Finally, even if it is assumed that the contract was rendered unenforceable as a violation of Michigan's law regarding agent appointment, the issue of Penn Life's ability of recover

---

[3]The record fails to indicate whether Korejsza acted as an "independent" agent by placing clients with insurance companies other than PharmaCare and Penn Life. At the same time, however, there is no record evidence suggesting that Korejsza was limited to placing clients with PharmaCare and Penn Life.

in quantum meruit remains. The Court therefore denies River Rouge's motion for summary judgment as to this issue.

## C. Waiver and Laches

In its final argument, River Rouge asserts that Penn Life forfeited its right to recover the unpaid premiums by failing to timely report the delinquency to River Rouge employees. In support of this claim, River Rouge relies on two separate legal theories: waiver and the doctrine of laches. A waiver occurs whenever a party intentionally abandons a known right. *Roberts v. Mecosta County Gen. Hosp.*, 433 Mich. 57, 64 n.4, 642 N.W.2d 663, 668 n.4 (2002). Meanwhile, the doctrine of laches applies where "the passage of time combined with a change in condition . . . make[s] it inequitable to enforce the claim against the defendant." *Twp. of Yankee Springs v. Fox*, 264 Mich. App. 604, 612, 692 N.W.2d 728, 734 (2004). Here, River Rouge argues that Penn Life's delay in reporting the delinquency to a River Rouge employee unreasonably facilitated Korejsza's continued embezzlement at River Rouge's expense.

While Penn Life's delay in contacting River Rouge may be relevant to the appropriate measure of damages,[4] it does not justify dismissal of Penn Life's claims. As previously discussed, it was River Rouge employees who initiated the payment procedure that utilized Korejsza as a middleman. In compliance with that procedure, Penn Life contacted Korejsza regarding River Rouge's delinquency on a monthly basis. Because River Rouge directed Penn Life to follow that procedure, Korejsza's knowledge of the delinquency can be imputed

---

[4] See the discussion of Penn Life's motion for summary judgment below.

11

to River Rouge. *See New Freedom Mortgage Corp. v. Globe Mortgage Corp.*, 281 Mich. App. 63, 79, 761 N.W.2d 832, 842 (2008) ("[N]otice by an agent is generally imputed to the principal."). Therefore, Penn Life cannot be said to have intentionally abandoned its right to collect the premiums nor would it be inequitable to enforce Penn Life's claims against River Rouge—the party responsible for Korejsza's involvement in the payment process. For these and the above stated reasons, the Court denies River Rouge's motion for summary judgment.

**IV. Penn Life's Motion for Summary Judgment**

Having determined that Penn Life's claims are not subject to dismissal, the Court must now consider Penn Life's motion for summary judgment. Penn Life argues that the Court should enter judgment in its favor for the amount of the unpaid premiums. There is no dispute in this case that Penn Life provided benefits to River Rouge's qualifying employees and retirees without being paid the corresponding premiums. There is also no dispute in this case that River Rouge paid the premiums to Korejsza who then embezzled the money. River Rouge opposes Penn Life's motion on grounds that Penn Life failed to mitigate its damages.

Mitigation is an affirmative defense that places the burden of proof on the defendant. *Fothergill v. McKay Press*, 374 Mich. 138, 140, 132 N.W.2d 144, 145 (1965). Failure to mitigate reduces the amount of damages obtainable by a plaintiff but only to the extent that the plaintiff failed to make reasonable efforts to minimize damages. *Bak v. Citizens Ins. Co. of Am.*, 199 Mich. App. 730, 736, 503 N.W.2d 94, 97 (1993). In this context, reasonableness is generally a question of fact for the jury. *Id.*, 199 Mich. App. at 739, 503 N.W.2d at 99.

Here, River Rouge argues that it was unreasonable for Penn Life to allow the unpaid

premiums to escalate for an extended period of time without directly contacting a city employee. River Rouge was delinquent in premium payments from the start of the policy in January 2007. After February 2007, however, Penn Life stopped sending billing notices to River Rouge employees. By the time River Rouge employees became aware of the delinquency, River Rouge had been delinquent for at least ten months and owed more than $125,000 in unpaid premiums.[5] Had Penn Life contacted River Rouge employees earlier, River Rouge likely would have discovered Korejsza's embezzlement. Even though River Rouge is responsible for using Korejsza as an agent, there is an issue of fact as to whether Penn Life's delay in bypassing Korejsza or terminating benefits was reasonable in light of River Rouge's extended and growing delinquency. For these reasons, the Court grants Penn Life's motion for summary judgment as to liability but denies the motion as to damages.

## V. Conclusion

The Court acknowledges that there is some inherent inequity in this case because of Korejsza's embezzlement. Korejsza, however, is not a party to this action and there is no way for this Court to remedy the inequity of his conduct. Rather, the main purpose of this lawsuit is to determine which party legally bears the financial burden of Korejsza's embezzlement. Focusing on this narrower issue, rather than the unfairness of the situation in general, makes it is easier to see that equity requires the burden to fall on the party or

---

[5]There is a factual dispute as to whether River Rouge obtained notice of the delinquency in October 2007 when Bodrie received an invoice as an attachment to an e-mail for an unrelated purpose. The amount due and owing in the October invoice was $127,586.30. (Pl.'s Mot. Ex. K.) Penn Life did not contact River Rouge employees for the purpose of resolving the delinquency until June 2008 when the amount due and owing exceeded $173,000. (Pl.'s Mot. Ex. L.).

parties responsible for instilling Korejsza in the payment process and making his continued embezzlement possible. Regardless of how those issues are resolved, the outcome of this case will appear unfair because both River Rouge and Penn Life seem to be innocent victims of Korejsza's wrongdoing.

For purposes of resolving the present motions, the record evidence reveals that River Rouge was initially responsible for involving Korejsza in the payment procedure. Nonetheless, there remain issues of fact as to the reasonableness of Penn Life's delay in bypassing Korejsza or terminating benefits and the date on which River Rouge acquired actual notice of the delinquency.

Accordingly,

**IT IS ORDERED** that River Rouge's Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Penn Life's Motion for Summary Judgment is **GRANTED IN PART** as to **LIABILITY** and **DENIED IN PART** as to **DAMAGES**.

                                                s/PATRICK J. DUGGAN
                                                UNITED STATES DISTRICT JUDGE

Copies to:
Kevin S. Toll, Esq.
Sheri B. Cataldo, Esq.
David F. Greco, Esq.
Ebony L. Duff, Esq.
John J. Gillooly, Esq.